**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

THE HUMANE SOCIETY OF THE UNITED STATES
1255 23rd Street, NW, Suite 450
Washington, DC 20037

THE HUMANE SOCIETY LEGISLATIVE FUND
1255 23rd Street, NW, Suite 455
Washington, DC 20037

ANIMAL PROTECTION OF NEW MEXICO
301 Gold Avenue SW, Suite 205
Albuquerque, NM 87102

HOLLY ANDREAS
11513 Manitoba Drive
Albuquerque, NM 87111

ELIZABETH REED
7502 Yachtsman Drive
Hudson, FL 34667

NANCY MEGNA
17 Quigley Road
Middletown, NY 10940

         *Plaintiffs*,

v.

NATIONAL INSTITUTES OF HEALTH
9000 Rockville Pike
Bethesda, Montgomery County, MD 20892

JAMES M. ANDERSON, *in his official capacity as
Deputy Director of the National Institutes of Health*.
9000 Rockville Pike
Bethesda, Montgomery County, MD 20892

         *Defendants*.

Civil Action No.  _____

**COMPLAINT**

**INTRODUCTION**

1.   Two decades ago, Congress enacted a clear mandate: any federally owned chimpanzee previously used for research must be transferred to the federal sanctuary system when no longer needed for that research. This lawsuit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, challenges the National Institutes of Health's ("NIH") circumvention of that mandate through the agency's decision to make forty-four federally owned chimpanzees (the "APF Chimpanzees") ineligible for retirement to the federal sanctuary system – even though the apes are no longer being used for biomedical research.

2.   Rather than retire these chimps to a sanctuary that will meet their physical, social, intellectual, and psychological needs, NIH has decided the apes will spend the remainder of their lives at the Alamogordo Primate Facility ("APF"), the very contractor-operated federal facility where many of these chimpanzees were subjected to invasive biomedical research. NIH should – and *must*, as a matter of law – provide a humane retirement for these chimpanzees, who have not been used or needed for research for more than twenty years, by transferring them to the federal sanctuary system.

3.   Chimpanzees (*Pan troglodytes*) share more than 98% of their genome with humans, making them *Homo sapiens*' closest living relative. Their similarity to humans led scientists to use chimpanzees as subjects for invasive biomedical experiments starting in the 1920s. In the following decades, chimpanzees in U.S. laboratories were frequently infected with viruses like HIV and Hepatitis C in a largely unsuccessful attempt to study disease progression.

4.  The physical and psychological trauma inflicted on these highly social and intelligent primates – both as a direct result of invasive research procedures and by the social isolation, maternal deprivation, inadequate veterinary care, and inherent lack of enrichment in the laboratory environment – has been well-documented. Acknowledging that this suffering is unjustifiable given the existence of superior alternatives to the use of chimpanzees as research models, most countries that previously used chimpanzees for research prohibited such activities by 2009. The United States remained the last holdout, despite scientific consensus that chimpanzees are no longer necessary for research. Then, in 2015, captive chimpanzees were listed as "endangered" under the Endangered Species Act ("ESA"), generally prohibiting invasive scientific experimentation on these animals in the United States.

5.  After the import of wild-caught chimpanzees was prohibited in 1975, the U.S. federal government, and NIH in particular, bred hundreds of chimpanzees for use in federally operated or supported biomedical experiments, resulting in a laboratory population of more than 1,800 chimpanzees by 1993. While many of these federally owned chimpanzees have died or been retired to the sanctuary system, more than 100 NIH-owned or NIH-supported chimpanzees still remain housed outside of the sanctuary system, in the same facilities where they were previously subjected to experimentation. This includes the thirty-seven surviving chimpanzees currently housed at APF, who are the subject of this lawsuit.[1]

---

[1] Several APF Chimpanzees have died or been euthanized since NIH made its decision not to retire these chimps to the federal sanctuary system.

6.  Recognizing the United States' moral obligation to provide for "comprehensive, compassionate lifetime care" of those chimpanzees who the federal government has subjected to invasive biomedical research, Congress passed the Chimpanzee Health Improvement, Maintenance, and Protection Act ("CHIMP Act") in 2000. While the CHIMP Act did not prohibit the use of federally owned chimpanzees in biomedical research, it established and funded a federal sanctuary system for these apes. Chimp Haven, which has been designated as the sole nonprofit sanctuary for federal chimpanzees, is located on 200 acres of forested land in Keithville, Louisiana and provides for the permanent retirement of laboratory chimpanzees in a natural habitat with access to top-quality veterinary and behavioral care. The CHIMP Act mandates that all federally owned chimpanzees must be retired to the federal sanctuary when deemed "not needed" for research. To date, more than 460 chimpanzees have been safely transferred to Chimp Haven for retirement (and hundreds of privately owned chimpanzees have been successfully retired to other sanctuaries).

7.  On November 17, 2015, following the listing of captive chimpanzees as endangered under the ESA, NIH announced that it would no longer authorize the use of chimpanzees for NIH-conducted or NIH-supported research. The same announcement determined that the roughly 300 NIH-owned chimpanzees remaining in laboratories at the time, including the APF Chimpanzees, became eligible for retirement to Chimp Haven as a result of this decision.

8.  NIH reaffirmed its commitment to permanent retirement in its 2016 "Plan to Retire All NIH-Owned and -Supported Chimpanzees," which contemplated the transfer of all chimpanzees from APF to Chimp Haven by 2021 "as required by" the CHIMP Act.

4

9.  The same 2016 Plan stated that all remaining NIH-owned and supported chimpanzees would be transferred to sanctuary by 2026.

10. Notwithstanding these commitments, NIH announced its decision not to retire the APF Chimpanzees to Chimp Haven on October 24, 2019 ("the Ineligibility Decision" or "the Decision"), even though the APF Chimpanzees will never again be used for research given scientific advancements and their listing as endangered under the ESA.

11. Per the Ineligibility Decision, NIH has reversed course and determined that it will permanently maintain chimpanzees at APF, where they will live out the rest of their lives – which in some cases could be for more than twenty years – in a barren environment without access to the superior veterinary care, behavioral therapy, open and natural environment, and dynamic social groups they would experience at Chimp Haven.

12. NIH's reversal purports that transferring the APF Chimpanzees to Chimp Haven represents too great a risk to their health. NIH's assessment of the alleged risks of transferring the APF Chimpanzees to Chimp Haven rests on a faulty and insufficient factual basis, and selectively ignores evidence that transfer is safe and would result in better health and welfare outcomes for these animals.

13. Moreover, the CHIMP Act mandates retirement to the federal sanctuary and does not grant NIH the discretion to decline to transfer a federally owned chimpanzee due to alleged health concerns. In fact, Congress contemplated that most chimpanzees used for biomedical research would have serious health problems, and correctly determined that proper veterinary and behavioral support would be *best provided by expert caretakers at a sanctuary*.

14. In addition to violating the clear mandate of the CHIMP Act, NIH's Ineligibility Decision, which was spurred by the recommendation of a single veterinarian employed by the contractor operating APF, rested on fatal factual errors and faulty assumptions and does not comport with NIH's own policies related to the relocation of federally owned chimpanzees. Further, the Decision overlooked evidence regarding the health status of individual chimpanzees, established protocols for safely transferring elderly chimpanzees to sanctuary, and the benefits of the sanctuary environment for their health and well-being.

15. NIH's Ineligibility Decision invoked discretion that is simply not afforded to the agency under the CHIMP Act. And, in wielding this fictional discretion, NIH arbitrarily and capriciously misevaluated the relevant facts and violated the agency's own precedent and policies related to the retirement of federal chimpanzees. Accordingly, because it violates the CHIMP Act and the APA, the Ineligibility Decision should be vacated and set aside as unlawful.

**PARTIES**

*Plaintiffs*

16. Plaintiff THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS") is a nonprofit organization headquartered in the District of Columbia, with a large office in Gaithersburg, Maryland and regional offices and direct animal care facilities located throughout the country. Founded in 1954, HSUS is the largest animal protection organization in the United States, representing millions of members and constituents nationwide. HSUS' mission is to fight the big fights to end suffering for all animals. To achieve this mission, HSUS actively advocates for better laws and regulations to protect

animals; conducts mission-specific campaigns to increase protections for domestic animals, wild animals, and captive wildlife; and advocates against practices that injure, kill, or otherwise harm animals, including animals used in research and product testing. Consistent with its mission to protect all animals, HSUS works to raise awareness about animals used for research and testing, and actively advocates for their protection before administrative agencies, Congress, corporations, and the general public.

17. HSUS has powerfully advocated for the protection of chimpanzees used for research, including chimpanzees owned by the federal government. Through its "Chimps Deserve Better" campaign, HSUS successfully: pushed for the enactment and implementation of the federal CHIMP Act in 2000 and its supporting amendments in 2007 and 2013 to ensure the retirement of federal chimpanzees to the sanctuary system; worked with Congressional allies in 2010 to empanel an independent scientific committee to evaluate the scientific justification for chimpanzee research; worked to ensure the recommendations of the scientific committee were properly implemented by the government; conducted undercover investigations revealing inhumane treatment at primate research facilities; lobbied pharmaceutical companies and laboratories to adopt humane alternatives to research on chimpanzees and provide lifetime care for retired chimpanzees; petitioned the U.S. Fish and Wildlife Service to extend ESA protections to captive chimpanzees; met with officials from NIH, the U.S. Department of Health and Human Services, and the U.S. Air Force to advocate for the permanent retirement to sanctuary of federally owned chimpanzees, including chimps at APF; and provided significant funding and support for the care of former research chimpanzees in the United States and abroad, including securing hundreds of thousands of dollars in

donations for Chimp Haven to ensure the retirement of federal chimpanzees from New Iberia Research Center. HSUS has regularly deployed its legal and scientific expertise to comment on rulemakings and other administrative actions regarding chimpanzees, and submitted two sets of formal comments to NIH as an agency working group developed and adopted a policy for assessing the safety of relocating federally owned or supported chimpanzees to sanctuary.

18. HSUS has suffered multiple injuries to its organizational resources and mission as a result of the Ineligibility Decision. The Ineligibility Decision injures HSUS and its members by undermining and diminishing the value of the tremendous investment that HSUS has made in securing the establishment and funding of the federal sanctuary system as a leading advocate for the CHIMP Act and its amendments, the extension of ESA protections to captive chimpanzees as the lead author of the ESA listing petition, and the cessation of privately and federally supported research on chimpanzees. These efforts collectively represent a campaign of more than twenty years, and a commensurately monumental investment of staff time and resources. By ignoring the CHIMP Act's mandate that all federally owned chimpanzees be retired at the federal sanctuary, the Ineligibility Decision undermines the efficacy of the legal protections for chimpanzees that HSUS fought hard to obtain. The Decision undercuts HSUS' organizational interest in the operation of those laws; perceptibly impairs HSUS' ability to ensure federal chimpanzees' retirement to sanctuary and frustrates HSUS' mission to protect all animals, including by securing greater protections for chimpanzees used in research; and wastes the significant organizational investment HSUS has made in

securing the establishment of the CHIMP Act and other legal protections for
chimpanzees.

19. Further, after the U.S. Fish and Wildlife Service granted HSUS' petition to list all
chimpanzees (whether captive or wild) as "endangered" under the ESA in 2015, NIH
announced that it would no longer support the use of chimpanzees in research and
deemed all federally owned chimpanzees eligible for retirement pursuant to the CHIMP
Act. In reliance on that commitment, as well as the CHIMP Act's clear mandate that
NIH retire surplus chimpanzees to the federal sanctuary, HSUS and its Chimps Deserve
Better campaign allocated staff time, funding, and other organizational resources
previously committed to advocating for federally owned chimpanzees' retirement to
sanctuary to other high-priority animal research issues in furtherance of HSUS' mission
and its members interests. For example, after NIH's announcement, HSUS and the
Chimps Deserve Better Campaign shifted resources to work focused on retiring privately
owned chimpanzees to Project Chimps, an HSUS-supported sanctuary. Now, as a result
of the Ineligibility Decision, HSUS has been forced to abruptly divert substantial
resources to essentially re-open its campaign for the permanent retirement of federally
owned chimpanzees. HSUS' forced expenditure of resources has included, but is not
limited to: educating members of Congress about the Ineligibility Decision and
responding to congressional offices' inquiries about the Ineligibility Decision, including
how it circumvents the CHIMP Act; advocating for legislative action, through
appropriations bills, to compel NIH to comply with the CHIMP Act's requirements –
which it skirted through the Ineligibility Decision; identifying, informing, and advising
its members about the Ineligibility Decision; and obtaining and reviewing documents

pertinent to the Ineligibility Decision so that HSUS can properly respond to the Decision. This diversion of resources was not voluntary: HSUS was required to divert resources to protect the organization's past efforts securing the retirement of federally owned chimpanzees to sanctuary – an outcome HSUS invested considerable time and resources to achieve and, as a matter of law, should have rightfully concluded in 2015. By causing HSUS to divert resources away from the pursuit of its core mission and goals and expend them on an issue that, as a matter of law, should have rightfully concluded in 2015, the Ineligibility Decision has injured and continues to injure HSUS and its members by impeding its ability to operate in furtherance of its mission.

20.   HSUS' injuries would be redressed by the relief requested in this suit. If the Ineligibility Decision is vacated, and NIH is required to comply with the CHIMP Act and the APA, HSUS' ability to ensure federal chimpanzees' retirement to sanctuary would no longer be impaired and HSUS' mission to protect all animals, including by securing greater protections for chimpanzees used in research, would no longer be frustrated by the Decision. Further, if the requested relief is granted, it would enable HSUS to allocate the organizational resources diverted by NIH's illegal action toward pursuit of its organizational mission, and restore the value of HSUS' resource-backed efforts to guarantee the permanent retirement of federally owned chimpanzees through the legally proper implementation of the CHIMP Act.

21.   Plaintiff THE HUMANE SOCIETY LEGISLATIVE FUND ("HSLF") is an animal protection organization incorporated under section 501(c)(4) of the Internal Revenue Code and operates as a separate affiliate of HSUS. HSLF was formed in 2004 and is based in Washington, D.C. HSLF's mission is to ensure that animals have a voice before

federal and state lawmakers by advocating for measures to eliminate animal cruelty and suffering, to educate administrative and elected officials, as well as the public on animal welfare issues, and to elect humane candidates to public office.

22.   HSLF has powerfully advocated for protection of chimpanzees used for research, including chimpanzees owned by the federal government. Specifically, HSLF advocated for the enactment and implementation of the CHIMP Act's amendments in 2007 and 2013, to ensure the permanent retirement of chimpanzees living at the sanctuary and continued funding of the sanctuary system; advocated for other legislation protecting chimpanzees used in research, including legislation that would end the use of invasive research in chimpanzees; opposed NIH's 2010 attempt to move chimpanzees housed at APF to another laboratory; and corresponded with federal agencies regarding research chimpanzees, including submitting, with HSUS, two sets of formal comments to NIH as an agency working group developed and adopted a policy for assessing the safety of relocating federally owned or supported chimpanzees to sanctuary.

23.   HSLF has suffered multiple injuries to its organizational resources and mission as a result of the Ineligibility Decision. The Ineligibility Decision injures HSLF by undermining and diminishing the value of the significant investment HSLF has made in securing the continued operation of the sanctuary system, and the permanent retirement of the chimpanzees who reside there, as a leading advocate for the CHIMP Act's amendments. These efforts represent a significant investment of staff time and resources. By ignoring the CHIMP Act's mandate that all federally owned chimpanzees be retired to sanctuary, the Ineligibility Decision undermines HSLF's work to ensure the continued operation of the sanctuary system and the permanent retirement of the chimpanzees who

reside there. The Decision perceptibly impairs HSLF's ability to ensure federal chimpanzees' retirement to sanctuary, frustrates HSLF's mission to secure measures to protect animals, including chimpanzees used for research, and wastes the significant organizational investments HSLF has made in securing the CHIMP Act's amendments.

24. Further, after the U.S. Fish and Wildlife Service granted HSUS' petition to list all chimpanzees (whether captive or wild) as "endangered" under the ESA in 2015, NIH announced that it would no longer support the use of chimpanzees in research and deemed all federally owned chimpanzees eligible for retirement pursuant to the CHIMP Act. In reliance on that commitment, as well as the CHIMP Act's clear mandate that NIH retire surplus chimpanzees to the federal sanctuary, HSLF significantly reduced its efforts seeking protections for laboratory chimpanzees. As a result of the Ineligibility Decision, HSLF has been forced to abruptly shift substantial resources away from other programs, such as efforts to protect other animals used in research and efforts to protect other animal species, to again campaign for the permanent retirement of federal chimpanzees. HSLF's forced expenditure of resources has included, but is not limited to: educating members of Congress about the Ineligibility Decision and responding to congressional offices' inquiries about the Ineligibility Decision, including how it circumvents the CHIMP Act; working with Congressional staffers and organizational partners to determine how to respond to NIH's decision not to transfer the APF Chimpanzees; advocating for legislative action, including through appropriations bills, to compel NIH to comply with the CHIMP Act's requirements – which it skirted through the Ineligibility Decision; and identifying, informing, and advising its supporters and the public about the Ineligibility Decision. This diversion of resources was not voluntary:

HSLF was required to divert resources to protect the organization's past efforts to enact and implement the CHIMP Act's supporting amendments to ensure the continued operation of the federal sanctuary and the permanent retirement of chimpanzees living there. By causing HSLF to divert resources away from the pursuit of its core mission and goals and expend them on an issue that, as a matter of law, should have rightfully concluded in 2015, the Ineligibility Decision has injured and continues to injure HSLF by impeding its ability to operate in furtherance of its mission.

25.   HSLF's injuries would be redressed by the relief requested in this suit. If the Ineligibility Decision is vacated and NIH is required to comply with the CHIMP Act and the APA, HSLF's ability to ensure federal chimpanzees' retirement to sanctuary would no longer be impaired and HSLF's mission to secure measures to protect animals, including chimpanzees used for research, would no longer be frustrated by the Decision. Further, if the requested relief is granted, it would enable HSLF to allocate the organizational resources diverted by NIH's illegal action toward pursuit of its organizational mission, and restore the value of HSLF's resource-backed efforts to ensure the continued operation of the sanctuary system and the permanent retirement of the chimpanzees living there.

26.   Plaintiff ANIMAL PROTECTION OF NEW MEXICO ("APNM") is a nonprofit organization headquartered in New Mexico. APNM is the premier animal protection organization in New Mexico and has worked to protect all animals since 1979. The organization's mission is to advocate for the rights and humane treatment of all animals by effecting systemic change. APNM pursues this mission through education and

outreach as well as campaigns for policy change, including active support of legislative and regulatory action to address and prevent animal cruelty.

27. APNM began work to protect chimpanzees in the 1980s. APNM has worked extensively to advocate for the protection of chimpanzees used in research – particularly chimpanzees housed at research and laboratory facilities in New Mexico, including the facility currently named APF. APNM has: researched and exposed multiple animal welfare violations occurring in New Mexico primate research facilities over a period of several years; exposed violations of the federal Food & Drug Administration's Good Laboratory Practice regulations occurring in New Mexico primate research facilities; requested the New Mexico Attorney General investigate New Mexico primate research facilities' possible misuse of millions of dollars in taxpayer-funded endowments intended for primate care, leading the Attorney General to launch a Civil Investigative Demand in August 2002, and the state Court of Appeals to affirm that a primate research laboratory had to release financial documents to the Attorney General; successfully advocated for changes to state law to protect laboratory chimpanzees; relentlessly pursued and obtained information about the health status and living conditions of laboratory chimpanzees; pushed for the enactment of the federal CHIMP Act in 2000 and worked to ensure its supporting amendment of 2013 was passed to ensure the retirement of federal chimpanzees to the sanctuary system; raised over $21,805, which was matched by a foundation, for a total of $43,610 raised and given to support former research chimpanzees in sanctuary from New Mexico research laboratories; organized and conducted dozens of "work parties" at which volunteers made and transported thousands of enrichment items that were given to former research chimpanzees in the

custody of a sanctuary; established contacts in Santa Fe, Las Cruces, and Albuquerque to collect donations and organize fundraisers for the chimpanzees; worked with elected leaders in 2010 to empanel an independent scientific committee to evaluate the scientific justification for chimpanzees in research; organized tours of APF for local business leaders and elected officials so they could better understand the conditions in which these chimps live; worked with New Mexico's congressional delegation to exercise oversight of NIH-supported chimpanzee research; testified, alongside Dr. Jane Goodall and other experts, before a federal committee investigating the use of chimpanzees for biomedical research; and submitted comments on federal agency proposals pertaining to federally owned chimpanzees. In furtherance of its efforts to secure more humane conditions for chimpanzees used for research, APNM also uses its expertise and access to information to keep its donors and supporters – many of whom care deeply about the well-being of particular chimpanzees housed in federal laboratories – informed about the status and conditions of particular federally owned chimpanzees. APNM provides this information through regular newsletter updates, websites specifically devoted to the Alamogordo Primate Facility chimpanzees, social media posts, in-person and online events, and individual communications.

28. In 2010, APNM launched its "Chimpanzees to Sanctuary" campaign, focused on ending the use of chimpanzees in invasive testing, ensuring the permanent retirement of all retired research chimpanzees to sanctuary, and ensuring adequate funding and capacity for chimpanzee sanctuaries to provide permanent retirement for all retired research chimpanzees, while meeting their specialized needs. This campaign had a particular focus on the federally owned chimpanzees housed at APF.

29. In 2014, in collaboration with Plaintiff HSUS, APNM launched its Chimpanzee Sanctuary Fund. Through this fund, APNM has helped secure grants totaling $800,000 to sanctuaries Chimpanzee Sanctuary Northwest and Chimp Haven, with $690,000 of these dollars going to Chimp Haven to help support the care of former APF chimpanzees. APNM additionally helped secure a pass-through grant of $1,000,000 to Chimp Haven to support the sanctuary's expansion as it prepared to take in additional APF chimpanzees.

30. APNM has suffered multiple injuries to its organizational resources and mission as a result of the Ineligibility Decision. The Ineligibility Decision injures APNM's mission and the interests of its donors and supporters by undermining and diminishing the value of the substantial organizational investment made over thirty years in its campaigns and programs for chimpanzees used in invasive testing in New Mexico – especially APNM's efforts to secure the establishment and funding of the federal sanctuary system as an advocate for the CHIMP Act and its 2013 amendment and APNM's efforts to end the invasive testing on chimpanzees and ensure their permanent retirement to sanctuary. By ignoring the CHIMP Act's mandate that all federally owned chimpanzees be retired at the federal sanctuary, the Ineligibility Decision undermines the efficacy of the legal protections for chimpanzees that APNM fought to obtain. The Ineligibility Decision undercuts APNM's organizational interest in the operation of those laws; perceptibly impairs APNM's ability to ensure the APF Chimpanzees' retirement to sanctuary; and frustrates APNM's mission to secure the humane treatment of all animals, including chimpanzees used for research in New Mexico. The Ineligibility Decision also renders APNM's past efforts to protect chimpanzees less impactful and diminishes the value of

APNM's organizational investment by preventing the APF Chimpanzees from ever being transferred to the facility for the permanent retirement that APNM has worked to ensure would be available.

31. Further, APNM's extensive efforts to raise donations to support, fund, and help build capacity at chimpanzee sanctuaries, including Chimp Haven, were premised on NIH's express commitment to comply with the CHIMP Act and retire all eligible chimpanzees to the federal sanctuary, and the attendant need to ensure that sufficient capacity to provide for high-quality lifetime care of these chimpanzees – especially chimpanzees from APF – would be available. By failing to retire dozens of chimpanzees to sanctuary, the Ineligibility Decision diminishes the value of APNM's past efforts to build capacity at the federal sanctuary to accommodate all eligible chimpanzees to sanctuary, including the APF Chimpanzees.

32. Additionally, following NIH's 2015 announcement that it would no longer support the use of chimpanzees in research and deeming all federally owned chimpanzees eligible for retirement, APNM directed its staff time and organizational resources for its "Securing Sanctuary for Chimpanzees" program toward expanded efforts that would ensure adequate sanctuary capacity would exist when those chimps were retired. As a result of the Ineligibility Decision, APNM has been forced to abruptly divert substantial resources away from its efforts to raise awareness about and fundraise for sanctuaries to essentially re-open its campaign for the protection and permanent retirement to sanctuary of federally owned chimpanzees. APNM's forced expenditure of resources has included, but is not limited to: educating members of Congress about the Ineligibility Decision and responding to congressional offices' inquiries about the Ineligibility Decision, including

how that decision circumvents the CHIMP Act; advocating for legislative action to compel NIH to comply with the CHIMP Act's requirements – which it skirted through the Ineligibility Decision; establishing an APNM Washington, DC Office; hiring expert consultants; identifying, informing, and advising its members about the Ineligibility Decision; and obtaining and reviewing thousands of pages of documents pertinent to the Ineligibility Decision so that APNM can properly respond to the Decision. This diversion of resources was not voluntary. APNM was required to divert resources to protect the organization's past efforts securing the retirement of federally owned chimpanzees to sanctuary – an outcome APNM invested considerable time and resources to achieve and, as a matter of law, should have rightfully concluded in 2015. Further, APNM was required to divert resources to protect its past work to raise donations to support, fund, and help build capacity at chimpanzee sanctuaries, including Chimp Haven. By causing APNM to divert resources away from the pursuit of its core mission and goals – including funding the direct provision of care to chimpanzees at sanctuary – and expend them on an issue that, as a matter of law, should have rightfully concluded in 2015, the Ineligibility Decision has injured and continues to injure APNM and its donors and supporters by impeding its ability to carry out its mission.

33. The Ineligibility Decision additionally injures APNM's mission by making it more difficult to obtain information about the condition of individual chimpanzees, impairing APNM's ability to effectively secure private funding needed for chimpanzees in sanctuary. Donors and supporters rely on APNM to provide updates about the status of individual chimpanzees, including chimpanzees remaining at APF. While APNM is able to obtain limited information about the status of the APF Chimpanzees through public

annual reports, Freedom of Information Act requests and congressional inquiry, this information is substantially less thorough and more difficult to obtain than information about chimpanzees that have been retired to the federal sanctuary. By permanently consigning the APF Chimpanzees to a closed federal facility housed within a military base, the Ineligibility Decision materially diminishes the quality, quantity, and frequency of information that APNM is able to provide to its supporters and donors, and forces APNM to expend additional resources to obtain and synthesize what information is available.

34. APNM's injuries would be redressed by the relief requested in this suit. If the Ineligibility Decision is vacated, and NIH is required to comply with the CHIMP Act and the APA, APNM's ability to ensure federal chimpanzees' retirement to sanctuary would no longer be impaired and APNM's mission to secure the humane treatment of all animals, including chimpanzees used for research in New Mexico, would no longer be frustrated by the Decision. Further if the requested relief is granted, it would enable APNM to allocate the organizational resources diverted by NIH's illegal action toward pursuit of its organizational mission, restore the value of APNM's efforts to secure the permanent retirement of research chimpanzees through the legally proper implementation of the CHIMP Act, restore the value of APNM's efforts and investment in ensuring sufficient sanctuary facilities are available to provide for the permanent retirement of all federally owned chimpanzees, and enable APNM to provide its donors and supporters with high-quality information about the APF Chimpanzees.

35. Plaintiff HOLLY WYNN ANDREAS is a New Mexico resident. From 1987 through 1989, Ms. Andreas was employed at APF (then called the Primate Research Institute). In

the course of her employment as a late-night security officer and maintenance worker at APF, Ms. Andreas had frequent and close contact with the chimpanzees housed at the facility. During this time, she developed close and personal relationships with numerous individual chimpanzees, including several surviving chimpanzees who remain at APF and who will never be retired to the federal sanctuary under Defendants' Ineligibility Decision.

36.   Inspired by the deep bonds she forged with the chimpanzees she met at APF, Ms. Andreas has become a lifelong advocate for the welfare of chimpanzees. She has written letters to the editor and corresponded with legislators about the use of chimpanzees in research. She has donated money and volunteer hours to non-profit organizations working to improve the lives of chimpanzees currently or formerly used in research, including the Jane Goodall Institute and Plaintiff APNM. She has also donated to Chimp Haven and both donated and personally volunteered for Save the Chimps, a chimpanzee sanctuary in Ft. Pierce, Florida. Through social media channels and her contacts with these chimpanzee advocacy organizations and sanctuaries, Ms. Andreas has taken great joy in following the lives of the chimpanzees she knows from her time at APF after their retirement by seeking photographs, videos, and newsletter updates.

37.   The Ineligibility Decision harms Ms. Andreas' recreational and aesthetic interests by preventing her from visiting, reconnecting with, and receiving informational updates about individual chimpanzees with whom she has a close and personal relationship. APF is a secure facility, housed on a military base, that is never open to the public. It provides no opportunity for interested members of the public to visit the chimpanzees housed there, and does not routinely publish photographs, videos, or other informational

materials about resident chimpanzees for public consumption. Because the Ineligibility Decision consigns the chimpanzees remaining at APF to live the rest of their lives there, Ms. Andreas will never have an opportunity to personally visit them, and is severely restricted in her ability to obtain information about them. Moreover, even if Ms. Andreas could somehow gain access to APF in order to visit the chimpanzees she knows, she would suffer emotional harm seeing them in an ethologically inappropriate, inhumane environment.

38. Chimp Haven has historically been open to the public at least four times per year, providing visitors an opportunity to view retired chimpanzees in their natural habitat. Although public visitor days have been suspended during the COVID-19 pandemic, Chimp Haven intends to resume them as soon as it is safe to do so. If the APF Chimpanzees were transferred from APF to permanent retirement at Chimp Haven, Ms. Andreas intends to travel to Chimp Haven in order to personally visit them as often as possible so that she can reconnect with them and enjoy viewing them in the natural, humane environment they deserve. Additionally, if the APF Chimpanzees are transferred to Chimp Haven, Ms. Andreas intends to stay informed about their lives in retirement by closely following APNM and Chimp Haven's social media accounts, newsletter, and other channels, and would be overjoyed to view photographs and videos of the transferred chimpanzees enjoying their retirement.

39. Plaintiff ELIZABETH REED is a Florida resident. She was employed as a caretaker at APF from 1985 through 1986, following thirteen years of service in the Air Force. In the course of her duties caring for infant and juvenile chimpanzees in the facility's nursery, Ms. Reed developed deep and lasting bonds with individual chimpanzees, including at

least two individuals who remain at APF and will never be retired to federal sanctuary as a result of the Ineligibility Decision. In her home, next to photographs of her children, Ms. Reed displays a framed photograph of herself with one of the chimps she developed a strong bond with at APF.

40. Ms. Reed remains active as an advocate for chimpanzees who were used in research. She is a donor to chimpanzee sanctuaries and non-profit organizations working to protect laboratory chimpanzees, including Plaintiff APNM, and frequently corresponds with these organizations to obtain information about the status of individual chimpanzees she knows from her work at APF. At least once per year, she speaks to local schoolchildren on behalf of the Vietnam Vets of America, and uses the opportunity to raise awareness about the need to help chimpanzees used in research. In 2017, Ms. Reed travelled to the Save the Chimps sanctuary in Ft. Pierce, Florida, and was able to reconnect with several chimpanzees she cared for as infants during her employment at APF.

41. The Ineligibility Decision harms Ms. Reed's recreational and aesthetic interests by preventing her from visiting, reconnecting with, and receiving informational updates about individual chimpanzees with whom she has a close and personal relationship. Ms. Reed is unable to visit these chimpanzees and is severely restricted in her ability to obtain information about them while they remain at APF. Even if she were able to access the chimpanzees at APF, Ms. Reed would suffer seeing them in the same sterile and ethologically inappropriate laboratory environment where they have spent their entire lives.

42. If the APF Chimpanzees were transferred from APF to permanent retirement at Chimp Haven, Ms. Reed intends to travel to Chimp Haven to personally visit them as often as

possible to reconnect with them and enjoy viewing them in a natural, humane, and ethologically appropriate environment. Additionally, if the APF Chimpanzees are transferred to Chimp Haven, Ms. Reed intends to stay informed about their lives in retirement by closely following APNM and Chimp Haven's publications, and would be overjoyed to view photographs and videos of the transferred chimpanzees enjoying their retirement.

43. Plaintiff NANCY MEGNA is a New York resident. After volunteering for a few weekends every month in 1991, Ms. Megna accepted full-time employment as a caregiver at the Laboratory for Experimental Medicine and Surgery in Primates ("LEMSIP"), a primate research facility in New York, from 1992 through 1996. In the course of her duties caring for infants and juveniles in the facility's nursery, Ms. Megna developed close relationships with several individual chimpanzees under her care.

44. Prior to LEMSIP's closure in 1998, the facility transferred many of its resident chimpanzees to the Coulston Foundation – a privately owned but federally funded entity that operated APF from 1993 until it declared bankruptcy and ceased operations in 2002. Prior to the Coulston Foundation's closure, NIH took ownership of 288 chimpanzees housed at APF; chimpanzees housed at a geographically separate Coulston facility in New Mexico were acquired by Save the Chimps and subsequently transferred to sanctuary in Florida. Some of the chimpanzees originating from LEMSIP still remain at APF, including individual chimpanzees that Ms. Megna knew, cared for, and developed relationships with during her employment at LEMSIP.

45. Ms. Megna left her career in primate research in 2002 due to the emotional pain inflicted by observing the inhumane treatment of primates in laboratory environments. Ms.

Megna has since remained an advocate for the welfare of chimpanzees used in research. Ms. Megna has served as a board member for nonprofit primate advocacy organizations and helped train primate care technicians about how to report Animal Welfare Act violations and methods to promote primate psychological well-being. Ms. Megna frequently donates to chimpanzee sanctuaries and takes action with non-profit organizations working to help current and former laboratory chimpanzees, including Plaintiffs HSUS and APNM. She avidly follows the newsletters, email lists, and websites of chimpanzee sanctuaries and animal protection organizations in order to stay informed about the status of retired chimpanzees, and takes tremendous joy in viewing photographs and videos of chimpanzees enjoying life in a sanctuary environment. Ms. Megna has traveled to chimpanzee sanctuaries on at least three occasions; during her visit to Save the Chimps with her daughter in 2016, she had the opportunity to reunite with several individual chimpanzees whom she knew during her employment at LEMSIP. In her retirement, Ms. Megna intends to move near a chimpanzee sanctuary in order to regularly volunteer there.

46. The Ineligibility Decision harms Ms. Megna's recreational and aesthetic interests by preventing her from visiting, reconnecting with, and receiving informational updates about individual chimpanzees with whom she has a close and personal relationship. Ms. Megna is unable to visit these chimpanzees and is severely restricted in her ability to obtain information about them while they remain at APF. Even if she were able to access the chimpanzees at APF, Ms. Megna would suffer seeing them in the same sterile and ethologically inappropriate laboratory environment where they have spent their entire lives following their transfer from LEMSIP.

47. If the APF Chimpanzees were transferred from APF to permanent retirement at Chimp Haven, Ms. Megna intends to travel to Chimp Haven to personally visit the chimpanzees she took care of as juveniles, reconnect with them, and enjoy viewing them in a natural, humane, and ethologically appropriate environment. Additionally, if the APF Chimpanzees are transferred to Chimp Haven, Ms. Megna intends to stay informed about their lives in retirement by closely following Chimp Haven's publications, and would be overjoyed to view photographs and videos of the transferred chimpanzees enjoying their retirement.

*Defendants*

48. Defendant NATIONAL INSTITUTES OF HEALTH is an agency of the United States Federal Government. NIH oversees the federal sanctuary system, holds title to the APF Chimpanzees, and is ultimately responsible for their retirement to federal sanctuary under the CHIMP Act.

49. Pursuant to a use agreement with the United States Air Force, NIH operates APF, located within Holloman Air Force base in Alamogordo, New Mexico.

50. Defendant JAMES M. ANDERSON is the Deputy Director of the NIH, and the Director of its Division of Program Coordination, Planning, and Strategic Initiatives. Dr. Anderson oversees the NIH division responsible for managing NIH-owned and supported chimpanzees, and is the official directly responsible for issuing the Ineligibility Decision.

**JURISDICTION AND VENUE**

51. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (actions against the United States).

52. The APA provides a waiver of the federal government's sovereign immunity. 5 U.S.C. § 702.

53. Venue is proper in this district under 28 U.S.C. § 1391(e), as Defendant NIH resides and is headquartered in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

54. This case is properly assigned to the Southern Division pursuant to Local Rule 501.4(b)(i), because NIH and its officer James M. Anderson are the only Maryland parties to the lawsuit and reside for the purposes of venue and maintain their principal place of business at Bethesda, Maryland in the Southern Division.

## BACKGROUND

### *The CHIMP Act and Its Amendments*

55. Congress enacted the CHIMP Act in 2000 in order to "provide for the lifetime care of chimpanzees that have been used, or were bred or purchased for use, in research conducted or supported by the National Institutes of Health, the Food and Drug Administration, or other agencies of the Federal Government." 42 U.S.C. § 283m(a). In relevant part, the CHIMP Act accomplishes this goal by establishing and funding a federal sanctuary system "to provide for the permanent retirement of surplus chimpanzees." *Id.* § 283m(a), (d)(1).

56. In 2002, Chimp Haven was chosen as the sole nonprofit contractor to operate the federal sanctuary, pursuant to the CHIMP Act's selection criteria. *See id.* § 283m(e).

57. The CHIMP Act mandates that "[a]ll surplus chimpanzees owned by the Federal Government *shall* be accepted into the sanctuary system." *Id.* § 284m(c) (emphasis

added). "Surplus chimpanzees" are defined as "chimpanzees that have been used, or were bred or purchased for use, in research conducted or supported by the [NIH] . . . or other agencies of the Federal Government, and with respect to which it has been determined by the Secretary [of Health and Human Services] that the chimpanzees are not needed for such research." *Id.* § 283m(a), (f)(4).

58.  In addition to providing a comfortable retirement in an ethologically appropriate environment and ensuring adequate lifetime veterinary care, Congress also intended the CHIMP Act to save the federal government money. The lifespans of former laboratory chimpanzees regularly exceed fifty years; to defray the substantial lifetime care costs that would otherwise be borne entirely by the federal government, the CHIMP Act funds the federal sanctuary system through a matching scheme. Under this scheme, the government pays for 90 percent of the costs of "establishing" the sanctuary, and 75 percent of the costs of "operating" the sanctuary. *Id*. § 282m(e)(4). The sanctuary is responsible for raising funds to cover all remaining costs. *Id*. The federal sanctuary system accomplishes further cost savings by realizing the economies of scale associated with caring for all federally owned retired chimpanzees at a single sanctuary, rather than at multiple laboratories scattered throughout the country.

59.  The cost savings associated with the federal sanctuary established under the CHIMP Act can be significant. In NIH's most recent accounting, the average cost to NIH per chimp per day at APF was $130.32, while at Chimp Haven it was only $35.65.

60.  Under the CHIMP Act as originally enacted, surplus chimpanzees which had been transferred to the federal sanctuary system could, under some circumstances, be recalled to laboratories for further use in research. In 2007, the enactment of the Chimp Haven is

Home Act amended this provision "by terminating the authority for the removal of chimpanzees from the system for research purposes." Chimp Haven is Home Act, Pub. L. 110-170, 121 Stat. 2465 (2007). Now, retirement is permanent once surplus chimpanzees enter the federal sanctuary, and they may no longer be transferred out of the sanctuary for further use in research.

61. Under the CHIMP Act as originally enacted, NIH's total contribution to the federal sanctuary system for chimpanzees was capped at $30 million – an amount that NIH projected would run out by the end of 2013. The CHIMP Act Amendments of 2013 removed the $30 million cap, reaffirming the CHIMP Act's directive to provide lifetime care for all surplus chimpanzees at the federal sanctuary and reflecting Congress' determination that provision of care at Chimp Haven is substantially more cost-effective than at individual laboratories. *See* CHIMP Act Amendments of 2013, Pub. L. 113-55, tit. III, § 301, 127 Stat. 641, 646 (2013).

*NIH Reassesses and Reduces Chimpanzee Research*

62. In 2010, NIH announced its intent to transfer about 200 chimpanzees from APF, where they had not been experimented upon for more than a decade, to a federal research facility in Texas where they would once again be subjected to invasive biomedical research. At the time of the announcement, fifteen of these chimpanzees had already been moved to the lab facility in Texas. In response, Plaintiffs HSUS, HSLF, and APNM, joined by other animal protection organizations and elected officials, urged NIH to reverse this controversial and scientifically unwarranted decision and convene an independent panel of experts to reconsider the ethics and scientific necessity of biomedical testing on chimpanzees.

63. NIH responded to these demands by cancelling the planned transfer and commissioning the National Academies' Institute of Medicine ("IOM") to produce a report assessing the use of chimpanzees in biomedical research. IOM's report, completed in 2011, did not identify *a single area* of biomedical research for which chimpanzees continued to be a necessary model. Inst. of Med. & Nat'l Research Council, *Chimpanzees in Biomedical and Behavioral Research: Assessing the Necessity* (2011) ("IOM Report").

64. The IOM Report highlighted the importance of humane treatment of chimpanzees and found that a critical component of humane chimpanzee care is that they "must be maintained either in ethologically appropriate physical and social environments or in natural habitats." *Id.* at 26-27.

65. Following publication of the IOM Report, NIH tasked a working group of the NIH Council of Councils to determine how to implement the Report's findings. The working group agreed with and adopted substantially all of the IOM Report's recommendations, including its "central principle" that chimpanzees be maintained in "ethologically appropriate physical and social environments," which the working group defined as "environments that not only *allow*, but importantly, *promote* the full range of natural chimpanzee behaviors." NIH Council of Councils Working Grp. on the Use of Chimpanzees in NIH-Supported Research, *Report* 2-3 (2013) (emphasis in original). Notably, at the time, the working group concluded: "The federal sanctuary system is the most species-appropriate environment currently available and thus is the preferred environment for long-term housing of chimpanzees no longer required for research." *Id.* at 36.

66. The working group developed ten concrete recommendations for ensuring an ethologically appropriate environment for chimpanzees. *Id.* at 3-4. These include the opportunity to live in sufficiently large and complex social groupings; year-round outdoor access with environmentally complex natural substrates such as grass, dirt, and mulch; foraging opportunities and a varied, nutritious, and challenging-to-obtain diet; daily provision of new nesting materials; environmental enrichment that provides an opportunity to express choice and self-determination; the presence of a sufficient number of specialized behaviorists, enrichment specialists, and trainers to ensure positive human-animal relationships and cognitive stimulation; and individualized management programs tailored to the unique social, psychological, behavioral and physical needs of each chimpanzee. *Id.*

67. Guided by the IOM Report and NIH working group's findings that (1) chimpanzees were no longer scientifically necessary for biomedical research and (2) captive chimpanzees must be maintained in ethologically appropriate environments that promote the full range of natural chimpanzee behaviors, NIH announced in June 2013 that it would "substantially reduce the use of chimpanzees in NIH-funded biomedical research and designate for retirement most of the chimpanzees it currently owns or supports," retaining only a colony of fifty chimpanzees for future research needs that would be provided with ethologically appropriate facilities as defined by the working group's adoption of the IOM Report criteria.

68. Following this announcement, in 2014, a coalition of sanctuaries and animal protection organizations including Chimp Haven, Save the Chimps, and Plaintiffs HSUS and APNM presented NIH with a detailed plan to implement the working group

recommendations and secure the permanent retirement of the 347 federally owned or

supported chimpanzees that remained inside laboratories at that time.

*Captive Chimpanzees Receive ESA Protections*

69.  Chimpanzees were originally listed as "threatened" under the ESA in 1976. That listing,

however, was accompanied by a special rule promulgated pursuant to Section 4(d) of the

Act that exempted *captive* chimpanzees from ESA protections. *See generally* Listing All

Chimpanzees as Endangered Species, 80 Fed. Reg. 34,500 (June 16, 2015) (describing

history of captive chimpanzee listing under the ESA). As a result, invasive biomedical

research techniques that would otherwise constitute an illegal "take" of a captive

chimpanzee in the U.S. were not prohibited. 16 U.S.C. § 1532(19) (defining "take" to

include "harass," "harm," "wound," and "kill"); *id.* § 1538(a)(1)(B) (prohibiting "take"

of listed species).

70.   In 1990 – following a petition from Plaintiff HSUS, the Jane Goodall Institute, and

other conservation organizations identifying the devastating decline of wild chimpanzee

populations – the U.S. Fish and Wildlife Service "uplisted" wild chimpanzees from

"threatened" to "endangered" under the ESA. Endangered and Threatened Wildlife and

Plants; Endangered Status for Chimpanzee and Pygmy Chimpanzee, 55 Fed. Reg. 9,129,

9,129-30 (March 12, 1990). But to allow biomedical research to continue, the agency

kept *captive* members of the species in the U.S. listed as "threatened" and left in place

the special rule under which captive chimpanzees in the U.S. received no ESA

protections. *Id.* at 9,129-30; 80 Fed. Reg. at 34,500. The agency later conceded that such

"split listing" had no lawful basis under its statutory authority.  80 Fed. Reg. at 34,501-

06.

71. In 2010, Plaintiff HSUS, along with a coalition of other animal protection and conservation organizations, petitioned the U.S. Fish and Wildlife Service to eliminate this "split listing" – under which "endangered" wild chimpanzees received full ESA protections, but "threatened" captive chimpanzees in the U.S. received none – by including captive chimpanzees in the "endangered" listing for the species. *Id.* at 34,500-01.

72. Responding to that petition, the U.S. Fish and Wildlife Service issued a final rule listing all chimpanzees, whether wild or captive, as "endangered" in June 2015. *Id.*; 50 C.F.R. § 17.11(h). This rule terminated the split listing approach that had denied ESA protections to captive chimpanzees in U.S. laboratories since 1976. Following this revision, captive chimpanzees, including chimps owned by the federal government, are now covered by the full breadth of ESA protections for endangered species, including strict prohibitions on import, export, and "take."  16 U.S.C. § 1538(a)(1) (prohibiting take, import, and export); 50 C.F.R. § 17.21 (implementing regulation for endangered species).

73. Because invasive biomedical research on captive chimpanzees that harms or harasses individuals would violate the ESA's prohibition on "take," such research is prohibited following the 2015 revision of the split listing rule. The U.S. Fish and Wildlife Service may issue permits authorizing otherwise prohibited conduct for "scientific purposes," but only after a public notice and comment period and only upon a finding that the issuance of the permit is consistent with the conservation purpose of the statute. 16 U.S.C. § 1539(a)(1)(A), (d); 50 C.F.R. § 17.22.

74. No such permits or findings have been issued by the U.S. Fish and Wildlife Service since the finalization of the agency's endangered listing for captive chimpanzees.

*NIH Ceases Biomedical Research on Chimpanzees*

75. In November 2015, NIH officially announced that, effective immediately, it would "no longer support biomedical research on chimpanzees," and would no longer maintain a colony of fifty chimpanzees for future research needs. NIH explained that this decision was motivated by the revised designation of captive chimpanzees as "endangered" under the ESA (which prohibited invasive research without a federal permit), as well as the total lack of any scientific need for biomedical research on chimpanzees (as no new research projects had been approved since NIH's 2013 reduction announcement).

76. As a result of this decision, all NIH-owned or supported chimpanzees have been formally designated "surplus chimpanzees" within the meaning of the CHIMP Act and are eligible for retirement at Chimp Haven. *See* The Use of Chimpanzees in NIH-Supported Research, 81 Fed. Reg. 6,873, 6,873 (Feb. 9, 2016) ("All NIH-owned chimpanzees that reside outside of the federal sanctuary system operated by Chimp Haven, Keithville, Louisiana, are now eligible for retirement."); *see also* Nat'l Insts. of Health, *NIH Plan to Retire All NIH-Owned and -Supported Chimpanzees*, https://orip.nih.gov/comparative-medicine/programs/nih-plan-retire-all-nih-owned-and-supported-chimpanzees (last visited Jan. 13, 2021) (after the November 2015 decision, "all NIH-owned and NIH-supported chimpanzees that reside outside of the Federal Sanctuary are eligible for retirement and relocation to the sanctuary as required by the [CHIMP Act].")

77. Even after NIH restricted its support for chimpanzee research in 2013 and terminated *all* support for such research in 2015, many federally owned or supported chimpanzees remained in laboratory facilities awaiting transfer to the federal sanctuary. According to

NIH's annual report for fiscal year 2016, 354 federally owned or supported surplus chimpanzees who were eligible for retirement to Chimp Haven remained at three laboratory facilities as of October 24, 2016: 138 at APF (including the APF Chimpanzees); 135 at the Keeling Center for Comparative Medicine and Research in Bastrop, Texas; and 81 at the Southwest National Primate Research Center (also known as the Texas Biomedical Research Institute) in San Antonio, Texas.

78.   NIH published a plan to provide for these surplus chimpanzees' "retirement and relocation to the [federal] sanctuary as required by the [CHIMP Act]" in 2016. Nat'l Insts. of Health, *NIH Plan to Retire All NIH-Owned and -Supported Chimpanzees*. This plan contemplated transfer of all chimpanzees from APF to Chimp Haven by 2021, and transfer of all remaining NIH-owned or -supported chimpanzees by 2026. *Id*.

*NIH Develops a Flawed System for Assessing Whether to Retire Surplus Chimpanzees to Sanctuary*

79.   On January 26, 2018, Defendant James M. Anderson announced that NIH's Council of Councils would establish a working group tasked with "assessing the safety of relocating chimpanzees" from laboratories to sanctuaries. At the time of this announcement, 288 surplus chimpanzees owned or supported by NIH remained in laboratories awaiting transfer to Chimp Haven.

80.   Plaintiffs HSUS and HSLF submitted substantive comments to NIH in response to this announcement. These comments emphasized NIH's legal and moral duty to permanently retire the remaining surplus chimpanzees at the federal sanctuary in accordance with the CHIMP Act. They also observed that the three laboratories still housing surplus chimps – APF, the Keeling Center for Comparative Medicine and Research, and the Texas

Biomedical Research Institute – lacked the capacity to provide remaining chimpanzees with the necessary standard of ethologically appropriate conditions and care, as defined by NIH's own adoption of the IOM Report's and working group's recommendations. Finally, these comments cited to a substantial body of scientific literature demonstrating the safety of transporting chimpanzees to sanctuary, and the physical, psychological, and social benefits of the sanctuary environment.

81.   NIH published the recommendations of this working group five months later. Request for Information, 83 Fed. Reg. 27,012 (June 11, 2018). In relevant part, the working group recommended that NIH should relocate all surplus chimpanzees to Chimp Haven unless doing so is "extremely likely" to shorten their lives, that NIH should develop a standardized approach for evaluating the health of individual surplus chimpanzees to inform relocation decisions, that all facilities housing NIH-owned or -supported chimpanzees adopt the American Society of Anesthesiologists' standardized five-category scale to categorize the health status of individual surplus chimpanzees, and that independent veterinary opinion be sought when the "sending" and "receiving" facilities disagree about whether to relocate a particular chimpanzee. Council of Councils Working Grp. on Assessing the Safety of Relocating At-Risk Chimpanzees, *Report* 26-31 (2018).

82.   Plaintiffs HSUS, HSLF, and APNM submitted substantive comments responding to the working group's recommendations. HSUS' and HSLF's comments again emphasized NIH's legal obligation to retire surplus chimpanzees to the federal sanctuary and underscored the lack of any legal basis for the premise that disease or other chronic health conditions may constitute a valid reason not to transfer a surplus chimpanzee to

the federal sanctuary in defiance of this obligation. HSUS' and HSLF's comment also rebutted the working group's assumption that a chimpanzee must be anaesthetized prior to transfer and referenced specific examples where chimpanzees had been transferred from laboratories to sanctuaries without anesthesia.

83. Responding to the working group's individual recommendations, HSUS' and HSLF's comment objected to the vagueness of the directive to retire chimpanzees unless transfer would be "extremely likely to shorten their lives," pointing out that hundreds of chimpanzees have been transferred from laboratories to sanctuary without death or complication in transit, including many with serious health problems such as cardiomyopathy, renal disease, and hypertension. It also noted that the "severe medical or behavioral conditions" that the working group identified as putting chimpanzees at risk during transport – such as diabetes or stress-induced behavioral problems – are common among former research chimpanzees, can be managed by expert staff at Chimp Haven, are in fact *exacerbated* in many cases by the laboratory environment, and do not in any case reduce the likelihood of successful transfer.

84. Finally, HSUS' and HSLF's comment agreed with the need for truly independent veterinary assessments when making relocation decisions, but strenuously objected to the working group's suggestion that independent assessment only be sought in cases of disagreement between the sending and the receiving facility. Noting that APF (which is operated by a for-profit private contractor) and the other two laboratories possess a clear financial interest in retaining surplus chimpanzees because their presence guarantees a federal revenue stream that covers salaries and facility overhead expenses, HSUS and HSLF opposed the obvious conflict of interest that would be generated if these

laboratories were responsible, in part, for deciding whether to retire individual chimpanzees to sanctuary.

85. On October 18, 2018, NIH released a report announcing its final decision on how it would assess the health risks associated with relocating the remaining surplus chimpanzees to sanctuary. This report did not adequately or meaningfully respond to the many glaring errors of fact and law identified in the comments submitted by Plaintiffs HSUS, HLSF, and APNM. Instead, it adopted nearly wholesale the working group's flawed recommendations.

86. In response to comments indicating that it was difficult to interpret the recommendation that chimpanzees should be retired to sanctuary unless doing so "is extremely likely to shorten their lives," NIH revised the recommendation to clarify the conditions under which the agency would not relocate chimps. Specifically, NIH revised the recommendation to explain that chimpanzees should be retired to sanctuary "unless relocation would severely and irreversibly accelerate deterioration of the chimpanzee's physical and behavioral health."

87. NIH made an additional revision to the working group's proposed recommendations: rather than seeking independent expert veterinary opinion only when sending and receiving facilities disagreed about relocation, the agency would seek veterinary opinion whenever *any* facility recommended not to relocate a chimpanzee. But the "independent expert veterinary opinion" NIH committed to seek was not "independent" at all. Instead, a panel of three veterinarians employed by NIH would review the laboratory veterinarian's recommendation against relocation based on records provided by the laboratory, with no in-person NIH veterinary assessment required. Nor was the opinion

"expert." The only qualification required for an NIH-employed veterinarian to sit on the reviewing panel was experience with *any* non-human primate (not necessarily chimpanzees), and NIH did not require that panel members include individuals with any expertise caring for chimpanzees in sanctuary or zoological settings, any expertise in chimpanzee behavior, anesthesia, or bioethics, or any experience transporting captive chimpanzees.

88. Under NIH's adopted protocol, a veterinarian employed by the laboratory can recommend for or against an individual chimpanzee's transfer to sanctuary based on the veterinarian's individual assessment of where the chimpanzee's health and behavioral conditions fit in a modified American Society of Anesthesiologists five-category physical status scale. The laboratory veterinarian's assessment and categorization receive considerable deference: the NIH panel remotely reviews decisions not to transfer chimpanzees on the basis of impressions and records provided by the laboratory, and does not conduct an in-person veterinary assessment of any individual chimpanzee, its social group, or its environment. A site visit is only required if a *consensus* of all three NIH panelists disagrees – on the basis of the materials submitted by the laboratory veterinarian and through conversations with the veterinarian at the sending and/or receiving facility – with the laboratory veterinarian's determination that the chimpanzee should remain at the laboratory.

*NIH's Ineligibility Decision*

89. NIH first applied its newly adopted protocol to the APF Chimpanzees in 2019. This decision-making process would culminate in the October 2019 Ineligibility Decision. The forty-four APF Chimpanzees – whose transfer NIH ultimately denied – represent

nearly one-third of the 138 chimpanzees who were awaiting relocation from APF to sanctuary in 2016 (the year after NIH announced it would no longer support biomedical research on chimpanzees).

90. The Ineligibility Decision was spurred by the recommendation of a single veterinarian, employed by the private contractor operating APF, that not one of the forty-four APF Chimpanzees should be retired to sanctuary due to alleged health risks associated with relocating them to Chimp Haven.

91. Per NIH's protocol, a panel of three NIH-employed veterinarians began meeting in 2019 to review, based on records provided by APF, the laboratory veterinarian's recommendation not to relocate the APF Chimpanzees. During this process, no panelist ever personally travelled to APF to observe and assess individual APF Chimpanzees, their social groups, or the environment in which they live at the laboratory.

92. On September 12, 2019, the NIH panel completed its review and agreed with the APF veterinarian in every individual case, adopting APF's recommendation that not a single of the forty-four APF Chimpanzees be retired to the federal sanctuary.

93. Among the medical and behavioral conditions the NIH panel put forward as generating relocation risks were the need for daily diabetes medication, pre-diabetes, cardiovascular disease, poorly controlled hypertension, renal conditions, arthritis, a leg amputation, and the existence of social bonds with other APF Chimpanzees that, if disrupted, could negatively affect a chimpanzee's psychological well-being. In the case of *nearly every* individual chimpanzee, the NIH panel concluded that the potential for stressors associated with transportation, quarantine, change in social structure, and human care

provider "could" cause a fatal cardiac event, fatal cardiovascular event, or fatal diabetic crisis.

94.   In some instances, individual chimpanzees' medical records do not provide sufficient evidence to support medical conditions identified by the NIH panel as generating relocation risks.

95.   Even if medical conditions were accurately identified by APF and the NIH panel, the panel's evaluations exaggerated the actual risk those medical conditions pose *during transport* and failed to articulate an explanation for why transfer to sanctuary would, in every case, render the condition life-threateningly worse.

96.   Relatedly, these evaluations ignored evidence that chimpanzees with heart disease, renal problems, diabetes, and other identified conditions could be – and often have been – safely and successfully transferred from laboratories to sanctuary.

97.   Similarly, these evaluations failed to consider mitigation measures that could be taken to minimize any potential risks to the chimpanzees during relocation to the federal sanctuary.

98.   The evaluations entirely failed to consider the extremely well-documented medical, social, and behavioral *benefits* of transfer to a sanctuary environment, and the attendant likelihood that the medical conditions would be better managed by the superior staff and facilities provided at Chimp Haven.

99.   These evaluations failed to consider the well-documented *harmful* effects of the laboratory environment on chimpanzees' health and well-being, or assess the extent to which the identified conditions are exacerbated by such an environment.

100. At least one of these evaluations identified alleged risks to a chimpanzee caused by anesthesia, mistakenly assuming that every chimpanzee must be anesthetized during transit.

101. These evaluations relied on an irrational and subjective approach to assessing the cumulative impact of individual health and behavioral conditions.

102. These evaluations failed to show that the identified health conditions met NIH's standard that chimpanzees should only be withheld from sanctuary where transfer "*would severely and irreversibly accelerate deterioration* of the chimpanzee's physical and behavioral health." Instead, nearly every recommendation indicated that relocation "could" trigger a fatal event, citing individual chimpanzees' varied health issues.

103. These evaluations failed entirely to explain how transfer of a chimpanzee with conditions such as behavioral issues or chronic disease that is managed with medication and/or supportive care could cause *any* risk, let alone a risk that relocation "would severely and irreversibly accelerate deterioration of the chimpanzee's physical and behavioral health."

104. The NIH panel inappropriately deferred to the veterinary judgment of the laboratory veterinarian that moving these chimpanzees placed them at high risk despite the obvious conflict generated by the pecuniary interest APF's operating contractor has in retaining chimpanzees at the laboratory – and the federal funding guaranteed by their presence.

105. The NIH panel claimed its intent was to do "what is right for the animals." Yet, the panel failed to assess whether APF constitutes an "ethologically appropriate physical and social environment," defined by NIH as an "environment[] that not only *allow[s]*, but importantly, *promote[s]* the full range of natural chimpanzee behaviors." NIH Council

of Councils Working Grp. on the Use of Chimpanzees in NIH-Supported Research, *Report* 2-3 (2013) (emphasis in original). The NIH panel considered the APF Chimpanzees' health and behavioral conditions in a vacuum, neglecting entirely to consider the veterinary, social, and behavioral benefits that the APF Chimpanzees would enjoy in the natural and ethologically appropriate environment at Chimp Haven, or the commensurate harms they will continue to suffer in the bare and ethologically inappropriate laboratory setting at APF.

106. On October 24, 2019, NIH announced the NIH panel's recommendations, marking the consummation of the agency's decision-making process. Relying on the NIH panel's endorsement of the laboratory veterinarian's recommendation against transferring the APF Chimpanzees to sanctuary, NIH determined that it would never retire the APF Chimpanzees to Chimp Haven and would instead maintain them at APF for the rest of their lives.

107. NIH has made clear it will not revisit the Ineligibility Decision. In October 2020, Defendant James M. Anderson confirmed to the New York Times that NIH "will not review or reconsider the process," that the APF Chimpanzees "will not be further assessed regarding relocation," and that "[t]he determinations of the [NIH] panel are final." James Gorman, *Aging and Ailing Lab Chimps Are Still at Center of Fight for Sanctuary*, N.Y. Times (Oct. 6, 2020), https://www.nytimes.com/2020/10/06/science/lab-chimps-experiments.html.

108. Many of the APF Chimpanzees are in their thirties or early forties. Because laboratory chimpanzees regularly live more than fifty years, these chimpanzees face living another decade – or even two decades – at APF rather than spending their final years at Chimp

Haven as Congress intended. In fact, NIH itself estimated that the last chimpanzees housed at APF will survive to 2043 (central estimate) with a range from 2038 to 2048.

109. The APF chimpanzees will be deprived of the superior medical, social, and behavioral benefits that Congress intended for them to receive at the federal sanctuary. And, as the years pass, surviving chimpanzees will likely be subjected to increasingly dire conditions as members of their social groups die. Chimpanzees are highly social animals; in the wild they live in complex communities comprised of multiple males and multiple females. The APF Chimpanzees already live in unnatural social conditions because they are housed in single-sex groups. As APF Chimpanzees die, the size of social groups will dwindle, and some chimpanzees may be singly housed for extended periods of time. For example, after his lone group member died, Lester, one of the APF Chimpanzees, was forced to live in social isolation for months – a situation incredibly detrimental to his welfare.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT ONE – Agency Action Not in Accordance with Law

110. The allegations set forth above in Paragraphs 1 to 109 are incorporated by reference.

111. The APA directs a reviewing court to vacate and set aside as unlawful any agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

112. The CHIMP Act establishes a federal sanctuary system "to provide for the permanent retirement of surplus chimpanzees," and mandates that "*[a]ll* surplus chimpanzees owned by the Federal government *shall* be accepted into the sanctuary system." 42 U.S.C. § 283m(a), (c), (d)(1) (emphasis added).

43

113. Congress has made a clear and unambiguous determination as to what is in the best interests of chimpanzees no longer being used in federally funded research: such chimpanzees must be transferred to the federal sanctuary. The CHIMP Act does not grant NIH, or any federal agency, the discretion to decline entirely to retire a chimpanzee to the federal sanctuary if the animal has been deemed a "surplus chimpanzee."

114. All NIH-owned chimpanzees, including the APF Chimpanzees, are "surplus chimpanzees" because they are "chimpanzees that have been used, or were bred or purchased for use, in research conducted or supported by the NIH . . . and with respect to which it has been determined by the Secretary [of Health and Human Services] that the chimpanzees are not needed for such research." *Id.* § 283m(a), (f)(4).

115. In issuing the Ineligibility Decision, NIH committed *not* to transfer the APF Chimpanzees, who are "surplus chimpanzees" within the meaning of the CHIMP Act, to retirement at Chimp Haven. In so doing, NIH violated the CHIMP Act's mandate that all surplus chimpanzees be retired to the federal sanctuary system and purported to exercise discretion that is not afforded to it under the CHIMP Act.

116. Accordingly, the Ineligibility Decision violates the CHIMP Act, and is therefore "an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(A).

**COUNT TWO – Arbitrary and Capricious Agency Action**

117. The allegations set forth in Paragraphs 1 to 109 are incorporated by reference.

118. Even where an agency has discretion to decide what course of action to undertake under the law, the APA directs a reviewing court to vacate and set aside any such agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

119. The Ineligibility Decision is premised on an incomplete, erroneous, and inadequately reasoned assessment of both the APF Chimpanzees' health status and the risks that such status would individually and cumulatively pose during and after transfer to sanctuary.

120. The Ineligibility Decision relied on false assumptions about the chimpanzee transport process, including the assumption that chimpanzees must be anesthetized during transport.

121. The Ineligibility Decision inadequately considered and/or failed entirely to consider key evidence and crucial aspects of the problem at hand, including the veterinary and behavioral benefits that the APF Chimpanzees would receive at Chimp Haven, the ongoing harm to the APF Chimpanzees' health and well-being caused by their retention at APF, measures that could be taken to mitigate any potential risk, and the many examples of safe and successful transport of chimpanzees with serious health conditions.

122. The Ineligibility Decision breaks from and violates NIH's own precedents and established policies regarding the retirement of surplus chimpanzees without adequate explanation.

123. Accordingly, the Ineligibility Decision is inconsistent with the CHIMP Act and NIH precedents and policies and is "arbitrary" and "capricious" in violation of the APA. 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order:

a. Declaring that NIH's October 24, 2019 Ineligibility Decision violates the CHIMP Act, 42 U.S.C. § 283m, and is thus "not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A);

b. Declaring that NIH's October 24, 2019 Ineligibility Decision was "arbitrary" and "capricious" in violation of the APA, 5 U.S.C. § 706(2)(A);

c. Vacating and setting aside as unlawful the Ineligibility Decision;

d. Remanding the Ineligibility Decision to NIH with instructions to meet its statutory obligations under the APA and the CHIMP Act on remand;

e. Awarding Plaintiffs attorney fees and all other reasonable expenses incurred in pursuit of this action; and

f. Granting such equitable and/or declaratory relief as the Court deems necessary, just, and proper.


///

///

///

///

///

///

///

///

///

///

46

Dated: January 14, 2021

Respectfully submitted,
*/s/ Ralph E. Henry*

Ralph E. Henry (Bar No. 21559)
Nicholas Arrivo (Cal. Bar No. 296173)*
Margaret Robinson (D.C. Bar No. 241415)*

The Humane Society of the United States
1255 23rd Street NW, Suite 450
Washington, DC 20037
rhenry@humanesociety.org
narrivo@humanesociety.org
mrobinson@humanesociety.org
Telephone: (202) 676-2324
Facsimile: (202) 778-6134

*Attorneys for Plaintiffs*

*\* Pro Hac Vice application forthcoming*